IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JONATHAN J. LOOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 15-cv-215-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jonathan J. Loos seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in December 2011, alleging disability beginning on November 1, 2010.   (Tr. 12).   After holding an evidentiary hearing, ALJ Michael Hellman denied the application on November 18, 2013.   (Tr. 12-20).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 12.

Through counsel, plaintiff raises the following points:

1.    The ALJ failed to include in his RFC assessment all mental limitations assigned by the state agency consultant.

2.    The ALJ erred in finding that plaintiff had no medically determinable physical impairments.

3.    The ALJ erred in assessing the credibility of plaintiff and his aunt.

## Applicable Legal Standards

To qualify for DIB or SIS, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. § 404.1572.

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

In a DIB case, a claimant must establish that he was disabled as of his date last insured.  *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).   It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date.   *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work

experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Loos was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant

4

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Hellman followed the five-step analytical framework described above. He determined that Mr. Loos was insured for DIB through September 30, 2014, and that he had not engaged in substantial gainful employment since the alleged date of disability.[3]   He found that plaintiff had severe impairments of generalized anxiety disorder, panic disorder, posttraumatic stress disorder, depression, and attention deficit disorder.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, with the following mental limitations:

- Simple, routine and repetitive tasks;

- Work environment free of fast-paced production requirements;

- Only simple, work-related decisions with few, if any, workplace changes;

---

[3] The date last insured is relevant only to the DIB claim.

- Only occasional interaction with the public, co-workers and supervisors.

Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not disabled because he was able to do his past relevant work as a hand packager.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1979, and was 31 years old on the alleged onset date. (Tr. 186).

Plaintiff had a ninth grade education.   He was in special education classes. He worked in the past as a dry wall hanger, a laborer in a paint reclamation plant, and a line worker in a food packaging factory.   (Tr. 191).

Mr. Loos submitted a Function Report that was completed on his behalf by his ex-wife, Amanda Loos.   This report stated that he had trouble with comprehension and following instructions and had limited memory.   He had increased anxiety and could not handle stress or crowds.   Amanda Loos came to his house every morning to give him his medicine.   She came back at noon and he showered while she was there.   His children visited him every 2 to 3 days.   He did household chores but they took him a long time because he stopped and started.

6

He "barely" left his house because of his anxiety.   He could not stand, sit or walk for long because of back pain.   (Tr. 175-185).

Plaintiff's aunt, Annette Miner, submitted a report stating that plaintiff was "slow to understand directions" and had limited reading ability.   He worked slowly and got agitated with hard tasks.   Any exertion caused him back pain.   He could not handle stress and had panic attacks.   (Tr. 204-211).

### 2.   Evidentiary Hearing

Mr. Loos was represented by an attorney at the evidentiary hearing on October 31, 2013.   (Tr. 28).

Plaintiff testified that he had been living with his parents for about the past year.   He had gotten divorced in 2004.   His children were 15 and 12 at the time of the hearing.   He and his ex-wife shared custody.   (Tr. 32-33).

Mr. Loos last worked in November 2010.   He had an accident in which he smashed his foot.   After his worker's compensation claim was finished and he returned to work, he was fired.   He filed for unemployment compensation.   He looked for work while he was getting unemployment compensation.   (Tr. 46-47).

Plaintiff testified that he was unable to work because his anxiety got worse the older he got.   It was hard for him to be around groups of people.   When he was anxious, it was hard for him to talk and he felt like he may throw up.   At his jobs, he always had a friend who did the thinking and told him what to do, and he was the muscle.   He took medicine and went to counseling.   (Tr. 48-49).

He took Xanax, which helped calm him down, but it was still very hard for him to function in public or in crowds.   This was prescribed by his family doctor.

7

(Tr. 49-50).   His anxiety kept him from doing "almost everything."   He had

difficulty understanding things and concentrating.   He had ADHD.   He had an

abusive childhood.   He has posttraumatic stress.   (Tr. 53-54).

Mr. Loos testified that he did not do much on a typical day.   He lay around

and watched TV.   He did not cook.   He did more when his kids were there.   He

attended some of their sporting events if they were not too crowded.   His only

responsibility in the household was to keep his room picked up.   (Tr. 53-59).   The

thought of doing something, like coming to the hearing, made him "almost

physically sick" for two or three days.   (Tr. 64).

Mr. Loos also testified that his knees and back were "blowed out."   He said

he had "severely bad" pain throughout his body.   (Tr. 62).   He had car wrecks and

head injuries in the past.   Dr. Davidson had not done any tests or studies because

"we pretty much know why it's all there."   Plaintiff believes that his pain is from

arthritis because it is all old injuries and there is nothing that can be done except to

take medication.   (Tr. 67-68).

Annette Miner, plaintiff's aunt, testified that she brought him to her house

two or three times a week to give him and his parents "a change of pace."   He ate at

her house and watched TV.   (Tr. 69-70).   She testified that Mr. Loos had not been

anywhere except with his wife, mother or herself in the past year.   She said he was

"very slow" and was only able to get jobs because she or his mother knew

somebody, and he was only able to keep jobs because he worked with a friend.

(Tr. 73-75).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical

8

question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform work at all exertional levels, limited to only simple, routine and repetitive tasks; a work environment free of fast-paced production requirements; only simple, work-related decisions with few, if any, workplace changes; and only occasional interaction with the public, co-workers and supervisors.   The VE testified that this person would be able to do plaintiff's past work as a hand packager.   He would also be able to do other work such as sorter and small parts assembler.   If this individual were, in addition to the mental limitations, limited to sedentary work, he would be able to do the jobs of nut sorter, inspector and final assembler.   The VE did not give DOT numbers of the jobs she cited.   (Tr. 81-84).

### 4.    Medical Treatment

Plaintiff alleges that he became unable to work on November 1, 2010.

The earliest medical record is from primary care physician Robert Davidson, dated January 5, 2010.   Plaintiff was already an established patient; it was noted that he had anxiety.   He also complained of memory loss since a motor vehicle accident.   (Tr. 272).   An MRI of the brain ordered by Dr. Davidson was negative. (Tr. 322).

The records establish that Dr. Davidson regularly prescribed methadone and Xanax for Mr. Loos.[4]   In general, Dr. Davidson's office notes are brief and contain

---

[4] Methadone is a narcotic drug used as a pain reliever and as part of drug addiction detoxification and maintenance programs and is only available from certified pharmacies. http://www.drugs.com/methadone.html, visited on May 24, 2016.   Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression.   http://www.drugs.com/xanax.html, also visited on May 24, 2016.

little detail.

Mr. Loos went to the emergency room after having a seizure in June 2010. He had run out of Xanax and methadone. The diagnosis was drug withdrawal with seizure. (Tr. 393-394).

In July 2010, Dr. Davidson noted that plaintiff worked the night shift and it was hard for him to sleep in the day. His parents monitored his medications daily. Dr. Davidson prescribed a pain patch. In September 2010, plaintiff's foot was injured when a door fell on it at work. He had a nondisplaced fracture of the second metatarsal bone of the right foot. He was given a note for light duty with no weight bearing. (Tr. 267-277).

On November 12, 2010, Dr. Davidson noted that plaintiff had been sent home from work because his supervisor was afraid he was sick. He had a head cold. On November 24, 2010, Dr. Davidson released him to return to regular duty. (Tr. 265-266). On December 22, 2010, the office note reflects that plaintiff had run out of medicine early and had a seizure. His mother was to control the supply of his medications. Plaintiff's mother called Dr. Davidson on January 11, 2011, and said she had discovered that, when plaintiff stayed at her house, he had gotten into the pills. (Tr. 265).

Plaintiff complained to Dr. Davidson of pain in his neck, back and legs on January 21, 2011. He prescribed OxyContin and Percocet. The note says that they discussed pain control and refers to "not narcotic" and "withdrawal." The doctor wrote a prescription for "mail order w/c pharmacy." Plaintiff then called the office; the message slip says "Work Comp Co. did not receive script for

methadone in mail yet – Pt states that he won't get meds until day after they receive it.   He is requesting more methadone."   Dr. Davidson authorized the prescription. (Tr. 263-264).

Plaintiff complained of trouble sleeping in April 2011.   He was not working and was on unemployment.   Dr. Davidson prescribed Trazodone.   They discussed methadone; plaintiff was taking 4½ pills per day.   (Tr. 262).

Mr. Loos left a message for Dr. Davidson stating that he had a 4-wheeler accident and had been given Percocet in the emergency room.   He wanted something stronger.   Dr. Davidson wrote, "No – he is on methadone – trying to get off narcotics."   (Tr. 262).

Plaintiff had x-rays in the emergency room following his 4-wheeler accident. X-rays of the right elbow, right ankle and right foot were negative.   (Tr. 308).

On June 10, 2011, Dr. Davidson noted that plaintiff was not working and "doesn't sleep."   He was taking 4½ methadone pills a day.   He was to continue on that dosage.   (Tr. 261).   On July 6, 2011, plaintiff reported that he was "doing some work on [the] side" and he had soreness and pain.   Dr. Davidson noted that "Amanda monitors his meds."   He recommended that plaintiff try to decrease to 4 methadone pills a day on his own and see how it goes, but he wrote the prescription for 4½.   (Tr. 261).

In August 2011, Dr. Davidson wrote the following note:

> Heat exhaustion.   Shoes melted on roof.   150 lb [illegible].   Works
> hard.   110 lb sheets dry wall. Doing good on meds.   Stay on 4½.

(Tr. 260).

11

In November 2011, Dr. Davidson prescribed Adderall for ADD.   (Tr. 259). In December 2011 and January 2012, Dr. Davidson noted "much back pain."   He also noted that plaintiff's back pain "flares up periodically" and that he had a motor vehicle accident in 2005.   (Tr. 258).

Dr. Davidson continued to see plaintiff regularly through September 2013. The office notes mainly reflect Dr. Davidson's efforts to get plaintiff to taper off of methadone.   He prescribed a fentanyl patch which was helpful in that regard.[5] (Tr. 373, 423-432).   In September 2012, plaintiff was off methadone completely and was still using the patch.   His grandmother had recently died and his ex-wife was "suing for custody."   He had "extreme anxiety."   (Tr. 430).   However, in October 2012, Dr. Davidson noted that plaintiff was doing better and had started seeing a counsellor.   (Tr. 429).

Mr. Loos began seeing a counsellor at the H Group in November 2012.   (Tr. 473).   In December 2012, plaintiff reported that he was able to be out with his children when they visited him on the weekends and to do laundry and chores around the house, and to "do some basic weight training at home to keep fit."   The counsellor noted that plaintiff needed a lot of time to process things "due to his brain injury" and that he talked almost nonstop during their sessions.   (Tr. 469).

In January 2013, plaintiff had run out of his medications early and "doesn't remember how."   Dr. Davidson prescribed 24 Percocet tablets to last him until the

---

[5] Fentanyl patch is used for "[m]anaging severe chronic pain. Fentanyl patch is only for use when continuous, around-the-clock treatment is needed for a long time. It is only for use when other pain treatments do not treat your pain well enough or you cannot take them. Fentanyl patch should only be used by patients who have already been taking other narcotic pain medicine on a regular schedule and are tolerant to its effects."   http://www.drugs.com/cdi/fentanyl-patch.html, visited on May 24, 2016

prescription for the pain patch was due to be refilled.   He was also taking Xanax again and was to discontinue Adderall.   (Tr. 428).   In March 2013, Dr. Davidson discussed reducing the strength of the pain patch.   (Tr. 427).   In May 2013, plaintiff said he ran out of Xanax early and had an anxiety attack.   He had been tapering down on the pain patch.   Later that month, plaintiff called Dr. Davidson and said he had been hospitalized.   (Tr. 426).

Mr. Loos was hospitalized from May 18 to May 21, 2013, on a certificate for involuntary admission because he was disoriented and hallucinating.   He had recently stopped using methadone and was trying to decrease his use of a fentanyl patch and Ativan.   However, he had hurt his leg and increased his use of medications, which caused him to run out early.   The diagnosis was drug-induced psychotic disorder with withdrawal reaction.   He was discharged on Celexa, and was to follow up with counseling and medication management by a psychiatrist through the H Group.   (Tr. 417-418).

Plaintiff was seen by Psychiatric Advanced Practice Nurse Maggie Ackerman through the H Group.   After his discharge from the hospital in May 2013, she increased his dosage of Celexa and directed him to continue to take the medications prescribed by his primary care physician.   (Tr. 482).

In June 2013, Dr. Davidson noted that plaintiff saw a psychiatrist in the hospital and "feels much better."   In August 2013, Dr. Davidson for the first time used the "SOAP" method of note taking.   For objective observations, he recorded that plaintiff was alert and oriented x 3, was calm, had no depressive symptoms and his anxiety was under control.   The relevant diagnoses were chronic anxiety and

13

ADD.   (Tr. 425).

Plaintiff was hospitalized from September 5 to September 9, 2013.  The admitting note indicates that he was having "vague suicidal thoughts but without plan."  He had a history of alcohol and substance abuse but had been sober for 2 years.  He had a DUI at the age of 18 and another DUI about 7 years prior to admission, when he had a motor vehicle accident. He had been on opiate pain medication since the accident.  He admitted to having problems with abusing his pain medications and had gone through a substance abuse program at one point. He felt that his depression had been worsening for about 3 months and he was nearly crippled with anxiety.  Physical exam showed that he no joint tenderness, deformity or swelling and he had a full range of motion in all extremities. Neurological exam was normal.  His weight was described as normal.  On mental status exam, he was oriented to time, person, place and situation.  Recent and remote memory were good.  His affect was dysthymic and his flow of thought was tangential.  Concentration and attention were fair.  Thought content was within normal limits.  Intellect was below average and insight and judgment were poor. The diagnoses were major depressive disorder, recurrent, severe without psychosis; PTSD; opioid dependence; benzodiazepine dependence; and history of substance abuse, in remission.  The doctor suggested discontinuing Celexa and Adderall as his symptoms had worsened since he had been taking them.  She noted that the two drugs may be "working against each other" as one is a stimulant and one is a sedative.  (Tr. 492-497).  Adderall and Celexa were tapered and discontinued, and plaintiff was started on Fentanyl and Xanax, which he had done

well on in the past.   Within 48 hours, all suicidal thoughts were gone and his mood, anxiety and agitation were better.    By the time of discharge, he was smiling, interacting appropriately and was sleeping better through the night.    (Tr. 498-501).

On September 19, 2013, Dr. Davidson noted that plaintiff had been hospitalized with increased anxiety from September 6 to September 9.   His Xanax had been refilled by the psychiatrist.   Dr. Davidson's objective observations were that plaintiff was alert and oriented, and was less anxious than previously.   He weighed 215 pounds.   (Tr. 424).

Mr. Loos saw APN Ackerman on October 7, 2013.   He complained of feeling lightheaded and "tingling," as well as depressive symptoms.   She instructed him to discontinue his previous psychiatric medications and to start taking Prozac.   She advised him to get an appointment with his primary care physician as soon as possible.   (Tr. 476-477).

### 5.    Dr. Davidson's Opinion

Dr. Davidson stated in a report that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.    He said plaintiff was limited to standing/walking for a total of 2 hours a day and that he had no limitations in sitting.    He also had limitations in using his arms and hands.    He could occasionally kneel but could never climb, balance, crouch, crawl or stoop.   Dr. Davidson said that his conclusions were supported by medical/clinical findings of chronic low back pain; previous fractures of right leg, both arms and cervical spine; and previous surgery on the right knee.   (Tr. 485-488).

15

**6.   Consultative Physical Exam**

Adrian Feinerman, M.D., performed a consultative physical exam at the request of the agency in February 2012.   Plaintiff complained of back pain since 2001 and neck pain since 2004, of unknown origin.   He had never had back or neck surgery.   He also complained of pain in his knees and elbows, and said he "hurts all over, all the time."   On exam, plaintiff was 5'11" and weighed 246 pounds.   There was no deformity of the spine and no redness, warmth, thickening or effusion of any joint.   Grip strength was strong and equal.   Motor strength was normal throughout, and he had no muscle atrophy or spasm.   Neurological exam was normal.   Plaintiff had a full range of motion of the spine and of all joints. Straight leg raising was negative.   Ambulation was normal.   Plaintiff seemed confused and rambled.   The diagnostic impression was degenerative joint disease and chronic pain syndrome.   (Tr. 331-339).

**7.   Mental RFC Assessment**

Based on a review of the records, a state agency consultant assessed plaintiff's mental RFC in March 2012.   Dr. DiFonso concluded that plaintiff had generalized anxiety disorder and a history of intellectual deficit.   She concluded that plaintiff's cognitive and attentional skills are adequate to perform simple one-two step work tasks, but that his symptoms of anxiety moderately limit his ability to manage detailed tasks.   (Tr. 360-363).

## Analysis

Plaintiff first argues that the ALJ erred in that he gave great weight to Dr. DiFonso's opinion but failed to adopt all restrictions found by Dr. DiFonso in the

16

Mental RFC Assessment.   Specifically, Dr. DiFonso found that plaintiff was limited to one-two step work tasks.   The Commissioner argues that any error here is harmless because the job of nut sorter can be performed by a person who is limited to one-two step tasks.

The *Dictionary of Occupational Titles* ("*DOT*") specifies a "reasoning level" for each job.   A limitation to simple, repetitive, one or two step tasks corresponds to Reasoning Level 1:

> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

*Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702.

The VE did not give *DOT* numbers for the jobs that she testified about, but there is only one nut sorter job listed in the *DOT*.   That is DOT 521.687-086.   The job description is as follows:

> Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers.

DOT, 521.687-086 NUT SORTER, 1991 WL 674226.

The DOT specifies that the job of nut sorter is performed at the sedentary exertional level and requires Reasoning Level 1.   *Ibid.*

The VE testified that a person with the RFC assessed by the ALJ and who was limited to sedentary work would be able to do the nut sorter job.   She testified that there are 1400 nut sorter jobs in the state of Illinois.[6]   The ALJ's RFC assessment

---

[6] Plaintiff has not raised an issue as to the VE's estimate of the number of jobs in the state of Illinois.

limited plaintiff to simple, routine and repetitive tasks, with no fast-paced production requirements, involving only simple work-related decisions with few, if any, workplace changes.   The VE did not testify about the Reasoning Level required by the nut sorter job, and she was not asked whether a person who was limited to simple one-two step tasks could do the job.   See, Tr. 81-84.

The doctrine of harmless error applies in judicial review of administrative decisions.   *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).   An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be."   *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).   In *McKinzey*, the ALJ erred in not discussing the opinion of a state agency physician.   However, the Seventh Circuit held that the error was harmless because "no reasonable ALJ would reach a contrary decision on remand" based on that opinion.   *Ibid*.   In contrast, the doctrine does not apply where a review of the record only establishes that that "the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does."   *Spiva*, 628 F.3d at 353.   If all that can be said is that the ALJ *might* reach the same conclusion after carefully considering the entire record, then the error cannot be deemed harmless.   *Ibid*.

The Court agrees that any error in failing to include a limitation to one-two step tasks is harmless.   In view of the *DOT* description of the nut sorter job and the VE's testimony, there is no doubt that, had the ALJ included a limitation to one-two step tasks in the hypothetical question, the VE would have testified that the hypothetical person could do the job of nut sorter.   In his reply brief, plaintiff faults

18

the Commissioner for attempting to act as a vocational expert.   She might have a point if the VE had given no testimony at all regarding the nut sorter job, and the Commissioner, starting from scratch, argued that plaintiff could work as a nut sorter based on her own independent review of the *DOT*.   However, on this record, the Court is confident that, on remand, if the ALJ added a limitation to one-two step tasks to the present RFC assessment, he or she would find that plaintiff was able to do the job of nut sorter.

Plaintiff's second and third points are related.   Plaintiff argues that the ALJ erred in determining that he had no medically determinable physical impairments, and he also erred in assessing plaintiff's credibility.

Dr. Feinerman diagnosed plaintiff with degenerative joint disease and chronic pain syndrome.   Dr. Feinerman was acting as a state agency consultant and he examined plaintiff at the request of the agency.   The ALJ rejected those diagnoses because there were "no clinical or diagnostic findings in the record to support these diagnoses."   Citing to 20 C.F.R. §404.1508, the ALJ stated that "Symptoms alone do not give rise to medically determinable impairments."   (Tr. 15).

The ALJ failed to consider that plaintiff was prescribed narcotic pain medications on an ongoing basis throughout the period in question.   The ALJ mentioned pain medication only once: in the last paragraph on Tr. 18, he stated that plaintiff testified that "he suffered from pain, but that there was nothing that could be done for him other than to take medications."   The ALJ rejected plaintiff's claim of pain because Dr. Davidson did not order x-rays or run tests.

19

The Seventh Circuit has made it clear that an ALJ may not reject a claimant's allegation of pain solely because it is not supported by objective evidence:

> It is understandable that administrative law judges want diagnostic confirmation of claims of pain. Without such confirmation the administrative law judge has to determine the applicant's credibility, and it is often very difficult to determine whether a witness is telling the truth—especially when as in this case he has an incentive to exaggerate. But as numerous cases (and the Social Security Administration's own regulation) make clear, an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain but only the applicant's or some other witness's say so: "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96–7p(4); see, e.g., *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

*Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015).

Further, the ALJ was required by 20 C.F.R. §404.1529(c)(3)  to consider plaintiff's use of pain medication in evaluating the intensity and persistence of his symptoms.   And, he was required to consider plaintiff's use of pain medication in assessing his credibility.   See, SSR 96-7p, 1996 WL 374186.   The ALJ's failure to do so here was error.

It is true, as the ALJ noted, that 20 C.F.R. §404.1508 states that a physical impairment must be established by medical evidence and not only by the claimant's statements.   However, the ALJ was too quick to conclude that there was no medical evidence to support plaintiff's claim of a physical impairment.   The medical records and Dr. Davidson's report establish that plaintiff had at least one serious motor vehicle accident and he suffered injuries, including fractures, in the past.   Dr. Davidson's notes suggest a link between the motor vehicle accident and

plaintiff's complaints of pain.   The portions of Dr. Davidson's notes that are in the transcript do not contain any reports of spinal x-rays or other studies of his spine. It is evident, though, that Dr. Davidson was treating plaintiff before the earliest office note in the transcript.   The content of the earliest office note indicates that Dr. Davidson had been prescribing narcotic pain medication for plaintiff for some time.   Plaintiff related his pain to arthritis from his old injuries, and testified that Dr. Davidson had not done any tests or studies because "we pretty much know why it's all there."   In these circumstances, it was error for the ALJ to dismiss plaintiff's claims of physical pain as unsupported by medical evidence without evaluating this evidence.   It is error for an ALJ to discuss only evidence supporting his conclusion while ignoring evidence that undermines it.   *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014).   "The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record."   *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014).

The Seventh Circuit has observed that it is improbable that health care providers would prescribe drugs if they believed that the patient was faking his symptoms.   *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).   Here, Dr. Davidson prescribed narcotic pain medications for Mr. Loos for an extended period of time.   This suggests that Dr. Davidson, at least, believed that Mr. Loos experienced pain.   The ALJ mentioned only in passing that plaintiff took pain medication.   He failed to explain how he reconciled the repeated prescriptions for narcotic pain medications with his conclusion that plaintiff did not have a medically

21

determinable physical impairment which caused him pain.

The ALJ is "required to build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015)(internal citation omitted). ALJ Hellman failed to do so here. As a result, his decision is lacking in evidentiary support and must be remanded. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Loos was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jonathan J. Loos' application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 26, 2016.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

22